2026 IL App (1st) 241128-U

FIFTH DIVISION
March 31, 2026

No. 1-24-1128

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| MUHAMMAD AFRIDI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2022 L 7127 |
| | ) | |
| NORTHSHORE UNIVERSITY HEALTH SYSTEM, INC., | ) | Honorable |
| a Corporation, d/b/a Evanston Hospital, a Corporation, | ) | Maria Slattery-Boyle, |
| | ) | Judge Presiding. |
| Defendant-Appellee. | ) | |

_____

JUSTICE MIKVA delivered the judgment of the court.
Justice Wilson concurred in the judgment.
Justice Wilson also specially concurred.
Justice Oden Johnson dissented.

**ORDER**

¶ 1    *Held*:   Judgment in favor of defendant hospital is affirmed. Mr. Afridi cannot demonstrate prejudice from the trial court's decision to allow video evidence disclosed after the close of discovery to be used for demonstrative purposes only, and the jury's verdict was not against the manifest weight of the evidence.

¶ 2    The plaintiff in this medical malpractice case, Muhammad Afridi, alleged that he was injured during a magnetic resonance imaging (MRI) procedure he underwent at Evanston Hospital, owned and operated by defendant NorthShore University Health System (NorthShore). Following

a one-week trial, the jury returned a verdict for NorthShore. Mr. Afridi now appeals, arguing (1) that it was reversible error for the trial court to allow NorthShore to play a 30-second video of the MRI machine that was used for Mr. Afridi's procedure as a demonstrative aid when that video, if it had been properly categorized as real evidence, would have been inadmissible as untimely disclosed; (2) that the video was alternatively inadmissible because it lacked a proper foundation and its probative value was outweighed by its prejudicial effect; and that the jury's verdict was against the manifest weight of the evidence.

¶ 3    For the reasons that follow, we affirm.

¶ 4                                I. BACKGROUND

¶ 5    Mr. Afridi alleged in his complaint that he was injured on August 13, 2018, while undergoing an MRI of his left foot at Evanston Hospital. He alleged that the radiology technician who performed the procedure had a duty to place headphones used during it "in a manner so as not to snare [his] head and neck"; that the technician breached that duty; and that as a direct and proximate result he suffered severe neck pain, headaches, and "permanent neurological injury to his neck and body." Mr. Afridi sought judgment against NorthShore "for hospital, medical, drug and incidental expenses, pain and suffering, disability and disfigurement, lost wages and other general damages."

¶ 6            A. Pre-Trial Proceedings Concerning NorthShore's Video Evidence

¶ 7    On January 16, 2024, approximately two weeks before trial was set to begin, NorthShore emailed Mr. Afridi's counsel to inform him of its intent to present photos and "a short demonstrative video of the MRI room/machine and control room" at trial. The email invited counsel, if he wished, to schedule a time for his own site inspection. Mr. Afridi's counsel declined, stating that discovery had closed and the untimely disclosure of this evidence was prejudicial to

his client. Mr. Afridi then moved to bar any evidence concerning NorthShore's inspection of the MRI machine. He argued that there were no assurances that the photographic or video evidence depicted the same machine that was used for his MRI five years earlier or that it was in the same condition. Allowing this evidence, and in particular the videos, he insisted, would require a reopening of discovery so that his own expert could inspect the machine and ensure that it had not been "manipulated in some way." The videos were real evidence subject to applicable discovery deadlines, he argued, because NorthShore would use them to prove its own theory of the case—that the machine moved too slowly to have caused the injuries that Mr. Afridi alleged.

¶ 8      NorthShore argued in response that its witnesses would lay a proper foundation for the evidence at trial by testifying that they accurately depicted the MRI machine at issue in this case. It confirmed that the machine shown was the same one used on the day of Mr. Afridi's MRI and that it had remained in use at Evanston Hospital during the five years following the alleged incident. It argued that the photos and videos were demonstrative and not real evidence because NorthShore would not use them to reenact its version of events but merely to demonstrate how the MRI machine worked. The videos, which demonstrated the uncontested maximum speed at which the table entered the bore for imaging—20 centimeters per second—were a literal depiction of the testimony of the MR technologists retained by both parties regarding the speed and operation of the machine. Without a demonstrative exhibit, NorthShore argued, those were "just numbers out there that [would] mean nothing" to a jury. Mr. Afridi was expected to testify that the table moved "fast," but the jurors should see for themselves how fast it was actually capable of moving.

¶ 9      Following argument on the motion, the trial court allowed the photos but reserved ruling on the videos, so that it could view them and compare them to the testimony they were intended to demonstrate. The court deferred ruling on the matter on several other occasions and heard

additional argument from the parties just before trial. It ultimately allowed NorthShore to present one of the three videos that it had offered at trial as a demonstrative aid to "help the trier of fact understand and make him weigh the credibility of the individuals in regards to [the] speed [of the machine]." The video was not real evidence, the court explained, though it depicted the machine involved in the incident, because it was the placement of the headphones that was alleged to have caused the injuries, and "not the machine in and of itself." The court remained willing to entertain any additional objections to the admissibility of the video that Mr. Afridi's expert might raise.

¶ 10    The video selected for trial depicts an MR technologist standing to the left of a male patient and operating the machine. The patient lies on the table with his left foot positioned for imaging as the table moves forward into the bore. The patient wears headphones with the speakers covering his ears and the headband placed beneath his chin, with no cord or tubing connecting the headphones to the table.

¶ 11                            B. The Evidence at Trial

¶ 12    A one-week jury trial was held in this matter beginning on February 2, 2024. The trial court explained to the jurors that, for scheduling purposes, it would allow the parties to call witnesses out of order but that they should consider all of the evidence together, regardless of who presented it or when it was presented. We summarize that testimony here in the order most logical for consideration of the issues on appeal.

¶ 13                            1. Mr. Afridi's MRI Procedure

¶ 14                            a. Mr. Parekh

¶ 15    Nirav Parekh testified that he was a certified MR technologist employed by NorthShore, a position he had held since January 2018, and that he had performed nearly 10,000 MRIs prior to the one he performed on Mr. Afridi on August 13, 2018. Mr. Parekh testified that he and Mr. Afridi

were the only ones present during the procedure. After completing a safety screening, which included verifying that Mr. Afridi did not have any metal in or on his body, Mr. Parekh positioned Mr. Afridi's foot in the coil for imaging. Mr. Parekh explained that earplugs are used to block the noise of the machine itself, which is quite loud, while over-the-ear headphones are used to facilitate communication between the patient and the MR tech, to give the patient the option of listening to music, and to provide an additional level of hearing protection. Mr. Parekh provided Mr. Afridi, who had had an MRI before, with headphones and allowed him to place them on himself in a way that was comfortable. Mr. Parekh testified that there is "no standard way of putting them on" and that it is simply "what's comfortable for the patient." If the patient chooses not to wear the headphones at all, then that is their choice. Mr. Parekh agreed that it was his responsibility, however, to make sure the cord connecting the headphones to the table was "free from any potential snag so it wouldn't be hung up on anything."

¶ 16    On cross-examination by NorthShore, Mr. Parekh said that he could not specifically recall whether he put the headphones on Mr. Afridi or whether Mr. Afridi put them on himself. He explained that there is "a lot of slack" in the cord connecting the headphones to the table, and it was his standard practice to tuck it beneath the pillow so that it did not interfere with the images. He agreed that some MR techs instead place the cord on the patient's chest or shoulder. The jack the cord is plugged into is on the MRI table next to the patient's head and is "a standard headphone jack" like on "an old school CD player or something like that," with nothing preventing the cord from popping out of the jack if it is tugged on.

¶ 17    Mr. Parekh explained that he then proceeded with "landmarking," the process of slowly advancing Mr. Afridi's foot into the scanner so that the software could calculate the isocenter, a reference point used to identify the anatomy being scanned. He used a dial to slide the table into

the bore and explained that there are no measurements on the dial to show how fast the table is moving. Twenty centimeters per second is the maximum speed, but he did not reach that speed for Mr. Afridi's MRI. "[W]e normally don't use that for any of our patients," he explained, "We usually use the slowest speed possible."

¶ 18    As the table advanced, Mr. Parekh looked toward Mr. Afridi's foot to ensure it had not deviated from the landmark. Before Mr. Afridi had fully entered the bore, Mr. Parekh heard him cough once and halted the table to see if Mr. Afridi was okay. He asked Mr. Afridi if he could breathe and Mr. Afridi said that he could. At that time, the headphones were in the same position. Mr. Parekh did not witness any signs of choking, and the headphones had not, as Mr. Afridi later alleged, flipped over Mr. Afridi's head and onto the floor. Mr. Parekh left to inform the charge tech, who was in the console room, just on the other side of the door, and she joined them in the MRI suite. Together they assessed Mr. Afridi. He requested and was given earplugs instead of headphones, and he agreed to go ahead with the scan, which was completed with no further issues.

¶ 19    After the MRI, Mr. Parekh filed an incident report, writing that Mr. Afridi "felt a pulling and discomfort after [the] headphone cord got tangled under his pillow and sheets," that he "state[d] he was okay to continue [the] exam," and that he "[w]as given the option to have earplugs instead of the headphones." Mr. Parekh did not know what happened to the headphones after Mr. Afridi's MRI.

¶ 20    On cross-examination by NorthShore, Mr. Parekh testified that he had experienced patients who had trouble breathing before. Their faces would change color, and their lips might turn purple. If that happened, he would call a "code blue" throughout the hospital. He observed nothing like that with Mr. Afridi and saw no evidence that the cord to the headphones had choked him around his neck or chin. Mr. Parekh involved the charge tech simply because "[s]he was the person in

charge" and he "thought it would be a good idea to let her know." Counsel for NorthShore also asked Mr. Parekh about the video of the MRI machine, saying "[w]e have a video of the machine just demonstrating how the machine works, how the table moves." Mr. Parekh confirmed both that the video did not depict Mr. Afridi and that it did not attempt to show exactly how the machine was used during Mr. Afridi's MRI.

¶ 21   Mr. Parekh was recalled on direct examination by NorthShore and, after discussing his training and experience at length, was again shown, over plaintiff's counsel's continuing objection, the video of the MRI machine. Mr. Parekh testified that, based on his knowledge and experience, the video showed the table entering the bore at the maximum speed. He explained that a feedback system provided resistance as the dial to increase the speed was turned, making it impossible to go immediately from a stationary position to the maximum speed.

¶ 22   On cross-examination by plaintiff's counsel, Mr. Parekh agreed that he did not know precisely what the maximum speed of the MRI machine was until after he had given his deposition in this case. He acknowledged that in the report he submitted he chose "medical device malfunction" as the event type, but explained that he had to choose something, and that was "the closest one." He explained that an incident report is generated whenever there is a patient complaint, large or small, even where, as here, there was no evidence an injury had occurred.

¶ 23                                    b. Mr. Afridi

¶ 24   Mr. Afridi testified that in August 2018 he was 44 years old and working nine to ten hours a day, six days a week, as a rideshare driver. He explained that he could no longer do that work because the pain medication he now took caused drowsiness and because he suffered from sharp pains in his neck and head that affected his vision.

¶ 25   Mr. Afridi testified that on August 13, 2018, while admitted for surgery at Evanston

Hospital, he was transported from his hospital room to an MRI suite. He lay on the table, and the MR technician, Mr. Parekh, positioned his left foot in the boot. At Mr. Afridi's request, Mr. Parekh then placed an extra pillow under his head and covered him with a blanket. Mr. Afridi's arms and hands, though tucked under the blanket, were free to move. Mr. Afridi stated that Mr. Parekh then placed headphones on him with the headband under his chin and the speakers covering his ears. Mr. Afridi did not ask for the headphones to be placed in that fashion. The cord connected to the headphones was laid over Mr. Afridi's shoulder. Mr. Parekh explained that the headphones would play music during the scan and allow the two of them to communicate when Mr. Parekh left the room. Mr. Parekh, standing to the left of Mr. Afridi, began to slide the table into the bore while looking at Mr. Afridi's foot.

¶ 26    Mr. Afridi testified that during this portion of the procedure the machine moved "very fast." In the three or four seconds during which it travelled forward, he felt a sudden tightness around his throat, began to choke, and experienced a strong pinching pain at the back of his neck. Mr. Afridi testified that the headphones flipped off his head onto the floor, twisting his head and neck, and he began coughing. When asked if the table moved faster this time than it had during other MRIs he had undergone, Mr. Afridi at first said "No." His counsel asked the question again, and he said "Yes, sir. Sorry." On cross-examination by defense counsel, Mr. Afridi agreed that he in fact could not remember if the MRI seemed faster than other MRIs he had had.

¶ 27    According to Mr. Afridi, Mr. Parekh stopped the machine when he heard Mr. Afridi cough. Mr. Afridi explained to him, with tears in his eyes, that he was in pain, but Mr. Parekh "[kept] ignoring [him]." He placed the headphones back on Mr. Afridi's head, this time with the band over the top of his head rather than under his chin, and left the room to perform the MRI. Mr. Afridi continued to communicate that he was in pain using the call button on the headphones, and Mr.

Parekh assured him that he was okay. Mr. Parekh then came back into the room with a woman who pleaded with Mr. Afridi to finish the scan because he had a badly infected foot and it was necessary for his surgery. Mr. Afridi was given water to drink and agreed to complete the scan.

¶ 28    Back in his hospital room, Mr. Afridi explained to a nurse what had happened. She talked to a doctor, and he was given a collar to wear and "Norco and something with [an] IV."

¶ 29    Mr. Afridi agreed on cross-examination that prior to the events giving rise to this lawsuit he was self-employed, with income that fluctuated. He agreed that he suffered at that time from numbness in his feet and that in January and February of 2018 he had told providers at NorthShore that he was unable to drive for a period of time because of multiple health problems. Mr. Afridi was shown the video of the MRI machine and asked whether it was during the landmarking process or the MRI itself it that the headphones he was wearing were pulled off of him and fell to the floor. He at first said it was after the landmarking, then he said it was "[p]robably like before landmarking." Apologizing for his English, Mr. Afridi finally said, "I don't remember exactly."

¶ 30                                        c. Dr. Donovan

¶ 31    Dr. Susan Donovan testified that she was the MR technologist supervisor at Evanston Hospital, with over 40 years of experience in radiology and over 20 years doing MRIs. She oversaw the department and trained new MR techs. Dr. Donovan explained that the hospital had a total of five MRI machines, including two Siemens 3T machines, one of which was used for Mr. Afridi's MRI. A port for headphones was located at the end of the MRI table, near the patient's head. The headphones did not lock into place but simply "slip[ped] in the hole" and could easily be unplugged from the table.

¶ 32    Dr. Donovan said it was standard to offer patients ear plugs and headphones to wear simultaneously for hearing loss prevention, though patients could refuse one or both. Training did

9

not specify which way the headphones should be worn, or where any slack in the cord connecting them to the table should be placed. Either the MR tech or the patient placed the headphones on the patient's head, and the patient was then invited to adjust them for comfort. Patients were given a squeeze ball that they could use to call the MR tech if anything was wrong, and for an MRI of the foot, the patient's hands were not restrained in any way.

¶ 33    Dr. Donovan was also shown the video of the MRI machine. She confirmed that she was present when the video was taken, that it accurately depicted the Siemens 3T MRI machine used for Mr. Afridi's scan, and that it demonstrated both the machine's maximum speed and the positioning of a patient for a foot scan.

¶ 34    Dr. Donovan testified that MR technicians were trained to file an incident report detailing any patient complaint, no matter how serious or trivial, and that such reports ranged from serious allergic reactions to complaints regarding the temperature of the room. The reports were filtered through risk management and assigned to Dr. Donovan if follow-up with the patient was needed.

¶ 35    On August 14, 2018, the day after Mr. Afridi's MRI, Dr. Donovan and the assistant manager followed up with him in his hospital room. Mr. Afridi told them that his neck "got hurt going into the scanner" and that "the tubing was pulling on his neck." She was not sure exactly what he meant by this, but "didn't drill him on it." She just listened to what he had to say. Mr. Afridi was eating, appeared comfortable, and "was very pleasant." Dr. Donovan assured him they would look into the matter and then followed up with Dr. Parekh and the charge tech. She inspected the headphones that were used, found nothing wrong with them, and concluded that no further follow-up was necessary.

¶ 36    On cross-examination by plaintiff's counsel, Dr. Donovan explained that if a patient was claustrophobic, the MR tech would advance the table into the bore slowly, even for a foot exam.

If that was not a concern, then the maximum speed could be used. Dr. Donovan did not know the maximum speed of the machine off the top of her head, but accepted counsel's statement that, according to the manual, it was 20 centimeters per second. She agreed that the applicable standard of care was what a reasonably careful MR tech would do under similar circumstances and that that included making sure no lines were caught or pinched in any way as the patient was brought into the bore. Dr. Donovan agreed that most patients did not put the headphones on with the headband under their chin, but said that if they wanted to, they could.

¶ 37                  2. Testimony Regarding the Applicable Standard of Care

¶ 38                                   a. Mr. Perez

¶ 39    Mr. Afridi called Irvin Perez as an expert on the applicable standard of care. Mr. Perez testified that he had worked as a licensed MR technologist for Northwestern Medicine for about seven months and had performed hundreds of MRIs during that period. This was his first time serving as an expert witness. Mr. Perez testified that it was standard practice for MR technologists to not only offer patients headphones but to position the headphones on the patient. Having reviewed the depositions of Mr. Afridi and Mr. Parekh, the incident report, medical records, and photos of the type of headphones used during Mr. Afridi's MRI, Mr. Perez believed that Mr. Parekh had deviated from the standard of care—that he had failed to do what a reasonably careful MR technologist would do under like circumstances—in several respects.

¶ 40    Mr. Parekh first should not have allowed Mr. Afridi's scan to continue with the headphone band beneath his chin. Although Mr. Perez acknowledged that there was no "professional standard or guideline" prohibiting the band of the headphones from being placed in this manner, he explained that MR technologists were trained to "use medical equipment in the intent it was designed for." Mr. Parekh also failed to ensure the headphone cord was secured prior to the scan.

A reasonably careful MR technologist would have tucked the cord away or placed it on the patient's chest in a manner that prevented it from getting caught. And because Mr. Parekh was focused solely on Mr. Afridi's foot, he also did not notice that Mr. Afridi was choking for 3-4 seconds. In his own practice, Mr. Perez checked in with his patients, usually by requesting a thumbs up, before sending them into the machine's isocenter for scanning.

¶ 41     Finally, Mr. Perez stated that in his opinion, the speed at which Mr. Parekh advanced the table was too fast. He believed that the machine was going "about 20 centimeters per second into the machine." When asked by defense counsel how many inches per second that was, Mr. Perez incorrectly stated that it was 34 inches per second. Counsel corrected him, and he agreed that 8 inches per second "sound[ed] about right." Counsel suggested that, over a period of three to four seconds, the table therefore would have traveled "about, what, 24 inches?" to which Mr. Perez responded, "Yeah, about almost a yard."

¶ 42                              b. Mr. Rederer

¶ 43     NorthShore then called Matthew Rederer, an MR technologist and certified MR safety officer. After reading the depositions of Mr. Parekh and Mr. Afridi, as well as the manual for the Siemens 3T machine, Mr. Rederer believed that Mr. Parekh had complied with the applicable standard of care during Mr. Afridi's August 13, 2018, MRI.

¶ 44     In Mr. Rederer's view, allowing a patient to place the headphones on himself in a manner that he found comfortable did not violate the standard of care because MRI safety trainings did not address risk factors for headphone placement and there was no prescribed way to wear the headphones. Allowing the headphones to be placed with the band beneath the patient's chin was not a deviation from the standard of care if the patient found it comfortable and his ears were completely covered by the headphones.

¶ 45    There was similarly no single "correct" way to position the cord connecting the headphones to the table. Mr. Rederer agreed that a reasonable MR technologist would place the cord so that it would not be impeded. He explained though that in his experience, there is really no risk of the cord snagging on anything, as the other equipment in the room must be far enough away from the scanner for it function properly.

¶ 46    Finally, Mr. Rederer believed that Mr. Parekh did not deviate from the standard of care by looking toward Mr. Afridi's foot as he slid it into the bore rather than his head. He explained the importance of ensuring that the target body part enters the machine in the same location after being landmarked. In his opinion, Mr. Parekh behaved as any reasonably MR technologist would have.

¶ 47                          3. Mr. Afridi's Subsequent Treatment

¶ 48    Several of Mr. Afridi's treating physicians then described their efforts since 2018 to control his head and neck pain. Mr. Afridi saw board-certified neurologist Dr. Sandeep Aggarwal at Northwestern Hospital for this issue from November 2018 until the end of 2019. Dr. Aggarwal concluded that Mr. Afridi suffered from cervicogenic headaches, or headaches that radiate from the neck, and referred him for physical therapy and to a pain center for steroid injections to reduce inflammation in his neck. Dr. Aggarwal had already prescribed Mr. Afridi gabapentin—a seizure medication that is also used to stop the transmission of pain—"for a couple of things, some of [Mr. Afridi's] other conditions," but believed it should also help with his headaches. Mr. Afridi was also taking antidepressants and baclofen, a muscle relaxer, for pain management. Both gabapentin and baclofen can cause drowsiness. Dr. Aggarwal eventually had Mr. Afridi try acupuncture, increased his daily dose of baclofen, and had him go to a more comprehensive pain center, which diagnosed him with occipital neuralgia—inflammation of the nerve that runs down the back of the skull, which can cause pain to "shoot up to the front of the head," Dr. Aggarwal agreed on cross-

examination by defense counsel that an MRI of Mr. Afridi's cervical spine showed degenerative changes, or arthritic buildup, and that such changes are part of the natural course of aging and a common cause of the sort of pain Mr. Afridi experienced. He noted on redirect examination by plaintiff's counsel, however, that cervicogenic headaches can also occur as a result of trauma and that Mr. Afridi did not report having such headaches before the MRI on his foot.

¶ 49    Dr. Antoun Nader, an anesthesiologist and specialist in pain management testified that he treated Mr. Afridi at Northwester's pain clinic. A CT scan of Mr. Afridi's head and neck revealed no vascular abnormality that would explain his pain, and Mr. Afridi's neurologist had ruled out other potential causes. Dr. Nader administered approximately 15 steroid injections to Mr. Afridi's cervical and occipital nerves over a three-year period.

¶ 50    Because Mr. Afridi's pain improved only somewhat with medication and only temporarily with these occipital blocks, he was referred to Dr. Joshua Rosenow, a board-certified neurosurgeon at Northwestern Hospital, for a more permanent solution. During an outpatient procedure in March 2023 Dr. Rosenow implanted an occipital nerve stimulator in Mr. Afridi's neck that was connected to a rechargeable battery. This controlled Mr. Afridi's pain, though it did not completely eliminate it, and could remain in place as long as it was needed.

¶ 51    Each of these treating doctors testified that when recounting his medical history to them, Mr. Afridi stated that the pain in his neck and head began after his August 13, 2018, MRI. Each of them agreed, however, that they had no independent knowledge of what occurred during that procedure and held no opinion regarding the underlying cause of his pain.

¶ 52                              4. Causation Testimony

¶ 53                                  a. Dr. Moore

¶ 54    Mr. Afridi called Kenneth Moore, a headache specialist, to serve as his causation expert at

trial. Dr. Moore examined Mr. Afridi on September 13, 2023. Mr. Afridi explained to him that since his August 13, 2018, MRI he had experienced bilateral headaches that were aggravated by neck movement. By this time Mr. Afridi's occipital nerve stimulator had greatly reduced the severity of the headaches. Dr. Moore performed a segmental motor exam to test Mr. Afridi's neck extension, flexion, and rotation, and the results were normal.

¶ 55    Based on this assessment and on his review of over 5,000 pages of medical records, Dr. Moore opined that Mr. Afridi had sustained a permanent neurological injury from the acute trauma suffered during his August 2018 MRI and now suffered from post-traumatic cervicogenic headaches. He based this opinion on the fact that Mr. Afridi's pain began immediately after the MRI, and he had never had a significant headache problem before it. Dr. Moore stated that he was "one hundred percent sure" that the alleged injury caused, rather than contributed to Mr. Afridi's condition. If not for the impinged headphones, Mr. Afridi would not suffer from chronic headaches.

¶ 56    On cross-examination, however, Dr. Moore conceded that he could not describe the manner of the injury—whether it was caused by extension or flexion. He knew only that Mr. Afridi had alleged that his "head was jerked backwards." He agreed, however, that Mr. Afridi could not have sustained a "whiplash-like" injury because the MRI machine was not capable of providing the degree of acceleration and deceleration necessary for an injury of that type.

¶ 57    Dr. Moore also agreed on cross-examination that his ability to identify the source of Mr. Afridi's neck pain was limited. Dr. Nader had provided Mr. Afridi with therapeutic, rather than diagnostic nerve blocks, and the presence of the nerve stimulator now interfered with a further assessment. Dr. Moore was thus only able to conclude that Mr. Afridi's pain emanated from the cervical spine generally. He did not believe, however, that Mr. Afridi met the criteria for a

diagnosis of occipital neuralgia, as doctors at Northwestern had concluded. As he explained on re-direct, that condition involved frequent, shock-like pain that was inconsistent with the constant pain Mr. Afridi reported experiencing. Dr. Moore stated that it was common for physicians to use the term "occipital neuralgia" as a blanket diagnosis for pain in the back of the head. He maintained, however, that the mislabeling of Mr. Afridi's condition did not prevent him from concluding that his pain was post-traumatic.

¶ 58                                  b. Dr. Varadhachary

¶ 59    NorthShore called its own causation expert, Dr. Arun Varadhachary, a professor of neurology with board certifications in neurology and neuromuscular medicine. Dr. Varadhachary testified that he specialized in neuromuscular disorders affecting "the peripheral nervous system, nerve roots, [and] nerves themselves." Based on his review of the records and depositions in this case, Dr. Varadhachary opined that Mr. Afridi could not have suffered an acute injury causing his cervicogenic headaches during his August 13, 2018, MRI.

¶ 60    Dr. Varadhachary observed that it was difficult to tell from those materials exactly what had happened during the MRI. He agreed with Dr. Moore, however, that there was no evidence of a "whiplash-like injury," that Mr. Afridi suffered from cervicogenic headaches, and that the record did not show any evidence of these headaches prior to the MRI. He explained that he did not feel it was necessary to evaluate Mr. Afridi himself because he believed Dr. Moore's assessment of what Mr. Afridi was presently experiencing to be thorough and consistent with the records.

¶ 61    Dr. Varadhachary did not agree with Dr. Moore, however, that Mr. Afridi's headaches were caused by trauma he suffered during August 13, 2018, MRI. Rather, there were indications of "preexisting cervical pathology," or "nerve damage that would contribute to the development of these headaches at some point." On August 18, five days after the MRI, a CT scan showed no

structural injury to Mr. Afridi's bones or blood vessels, and there was no evidence of any cuts, bruises, or fractures. The scan did reveal some degenerative or arthritic changes in the vertebrae, however, and a narrowing of Mr. Afridi's foramen (the point at which nerve roots exit the spinal canal) indicated the presence of a chronic injury at least six months to one year old.

¶ 62    A subsequent MRI of Mr. Afridi's cervical spine performed at NorthShore at the end of August 2018 also showed no damage to Mr. Afridi's soft tissue or ligaments, nor any structural damage to his neck. Dr. Varadhachary opined that, had Mr. Afridi suffered an injury to his cervical spine during the August 13 MRI, that scan would have depicted some swelling or fluid retention in the surrounding muscles or tissues. Because it did not, he concluded the cervicogenic headaches were more likely a result of degenerative changes in the spine than an acute injury. He further testified that, due to the slow speed and short distance at which Mr. Afridi would have traveled into the bore, he could not have plausibly suffered a trauma of the nature and degree needed to cause a cervical spine injury.

¶ 63    On cross-examination, Dr. Varadhachary noted that he was not a headache specialist, but that it was his belief that this was not a headache case. Rather, the headaches were symptomatic of a separate neurological injury. He acknowledged that an X-ray done on August 16, 2018, showed only mild degenerative changes with "no acute bony abnormality" and that such changes were a common sign of aging. Dr. Varadhachary also agreed that the August 18, 2018, CT scan showed "cervical straightening" in Mr. Afridi's spine and notes from Evanston Hospital stated that this could be the result of muscle spasms following an acute injury. Prior to the MRI at issue, Mr. Afridi's records showed no evidence of cervical straightening. However, on redirect, Dr. Varadhachary explained that cervical straightening is common in certain professions—including driving—where a person spends a lot of time with his head bent forward. In Dr. Varadhachary's

view, Mr. Afridi's cervical straightening reflected a preexisting, chronic condition that may have been exacerbated by his occupation.

¶ 64                           C. Verdict and Post-Trial Motion

¶ 65    Following closing arguments and deliberation, the jury returned a verdict in favor of NorthShore on February 8, 2024, and the trial court entered judgment on the verdict the same day. Mr. Afridi moved for a judgment notwithstanding the verdict or for a new trial on March 5, 2024, and the court denied that motion on April 29, 2024.

¶ 66    Mr. Afridi now appeals.

¶ 67                           II. JURISDICTION

¶ 68    The trial court denied Mr. Afridi's timely posttrial motion on April 29, 2024. Mr. Afridi filed an initial notice of appeal on May 24, 2024, and an amended notice of appeal on May 29, 2024. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), which together govern appeals from final judgments entered by the circuit court in civil cases.

¶ 69                           III. ANALYSIS

¶ 70    On appeal, Mr. Afridi argues that (1) the trial court erred in admitting NorthShore's video of the MRI machine as demonstrative evidence and (2) the jury's verdict was against the manifest weight of the evidence. We address each argument in turn.

¶ 71                    A. Admissibility of NorthShore's Video Evidence

¶ 72    Mr. Afridi first argues that the trial court should not have permitted NorthShore to introduce its video of the MRI machine at trial as a demonstrative aid. He maintains that the video was real evidence, and if it had been treated as such, it should have been excluded as untimely, as it was introduced after the close of discovery. Mr. Afridi argues in the alternative that even if the

18

video was accurately classified as a mere demonstrative aid, it was inadmissible both because NorthShore failed to lay a proper foundation for it and because its prejudicial effect substantially outweighed its probative value. We review the trial court's rulings on matters of discovery and the admissibility of evidence, including demonstrative evidence, for an abuse of discretion. *Maxwell v. Hobart Corp.*, 216 Ill. App. 3d 108, 110 (1991); *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 29. We will find an abuse of discretion only where a ruling is "arbitrary, fanciful, or unreasonable," or where "no reasonable person would have taken the view adopted by the trial court." *Id.* Even where there has been an abuse of discretion, we will order a new trial only if the court's ruling "appears to have caused substantial prejudice affecting the outcome of the trial." *Id.*

¶ 73          1. The Nature of the Video and the Timeliness of Its Disclosure

¶ 74    A physical object, or a depiction of such, that is used at trial is substantive or "real" evidence when it has had "a direct part in the incident at issue" and "has probative value in and of itself." *Id*. ¶ 30. Demonstrative evidence, by contrast, has no probative value of its own but serves only "as a visual aid to the jury in comprehending the verbal testimony of a witness." *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341 (1991). Illinois Supreme Court Rule 218 (eff. Feb. 2, 2023) generally provides that discovery should be completed at least 60 days before trial.

¶ 75    Here, it is undisputed that NorthShore informed Mr. Afridi of its video of the MRI machine less than 60 days before trial and after all relevant discovery deadlines had passed. The parties agree that if the video was substantive or real evidence, as opposed to demonstrative, it was not admissible. They simply disagree over which category of evidence the video falls into.

¶ 76    It is well established that evidence may serve different purposes, and that it may be admissible for certain purposes and inadmissible for others. The video here, as a depiction of the actual MRI machine used for Mr. Afridi's procedure, could certainly be considered real evidence

19

if it was used to independently establish a fact at issue in this case concerning that machine or its use during Mr. Afridi's MRI. But NorthShore did not use video to independently establish any fact that was at issue in this case. It used it to demonstrate the maximum speed of the MRI machine, which witnesses testified to and which no one disputed.

¶ 77     Mr. Afridi testified that the table moved "fast"—fast enough to snag the cord of the headphones he was wearing and choke him and to flip the headphones from his head and send them crashing to the floor behind him. NorthShore's position was that this was impossible. The machine simply could not go fast enough to accomplish this, even if was operated at maximum speed. Everyone agreed that for the Siemens 3T MRI machine, the maximum speed at which the table could have moved into the bore was 20 centimeters per second. Mr. Parekh and Dr. Donovan both attested to this, and the figure was unrefuted by Mr. Afridi's retained experts Mr. Perez and Mr. Rederer, who reviewed the machine's operating manual when forming their opinions. But that information was not easy to visualize.

¶ 78     Courts typically look favorably upon the use of demonstrative evidence because jurors "understand better what they see, rather than what they hear." *Sharbono*, 2014 IL App (3d) 120597, ¶ 30. The average person may be unfamiliar with assessing the speed of an object in centimeters per second and unable to easily convert such measurements to more familiar references. Mr. Rederer, Mr. Afridi's own expert, appeared to struggle with this himself on the stand. The video here was not introduced to add anything substantive to the testimony of witnesses regarding the speed of the machine or how it operated. Rather, it was introduced for the limited purpose of demonstrating that testimony visually. Its disclosure after the close of discovery was therefore not a basis for its exclusion, and the court did not abuse its discretion by allowing it to be played for the jury.

¶ 79     We are unpersuaded by Mr. Afridi's argument the video must categorically be viewed as real evidence simply because it features the actual machine used during his August 2018 MRI. As the trial court reasoned, there was nothing special about the MRI machine itself in this case. Mr. Afridi did not allege that this particular machine was defective or malfunctioned but, rather, that Mr. Parekh's placement of the headphones, combined with the speed of the, was what caused his injury. The maximum speed of the machine was independently established by witness testimony, and the video was used only to visually demonstrate that speed for the jury.

¶ 80     As NorthShore notes, the cases Mr. Afridi cites for this proposition are ones in which a party attempted to introduce disputed facts central to its version of events under the guise of a demonstrative aid. In *Sharbono*, 2014 IL App (3d) 120597, ¶ 33, for example, treatise images, diagrams, and headings included in presentation slides "went well beyond merely trying to teach or educate the jury" on how radiologists evaluate breast legions and instead were used to support the defendant's theory that the plaintiff's legion was benign. In *Yanello v. Park Family Dental*, 2017 IL App (3d) 140926, ¶ 34, an expert used skulls not merely to show the jury what he meant when he used particular medical terms but  to  imply that the plaintiff's anatomy was identical to the skulls in ways that suggested the plaintiff's dental implants had not been negligently placed. In *French v. City of Springfield*, 65 Ill. 2d 74, 81-82 (1976), a movie intended only to familiarize the jury with the physical location where a car accident had occurred was misleading because it showed the scene four years later and during the day, when the accident happened at night, when a painted barricade would have reflected the headlights of an approaching vehicle. And in *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 168 (2006), a video animation was not intended to help the jury understand, generally, what a pulmonary embolism was or what effects a drug generally had on the human body but instead purported to show the disputed chain of events that the plaintiff

alleged had caused the decedent's death. Unlike the evidence at issue in these cases, the video here did not serve as a Trojan horse to sneak in disputed facts favorable to its proponent.

¶ 81    The video in this case demonstrated for the jury what the undisputed fact that the MRI machine had a  maximum speed of 20 centimeters per second meant. This demonstration may well have helped to support NorthShore's theory of the case and refute Mr. Afridi's. But the value that this demonstration had to the defendant does not change the fact that the video was simply a visual demonstration of an undisputed fact that had already been testified to by the witnesses in this case.

¶ 82                              2. Admissibility of the Video as a Demonstrative Aid

¶ 83    Mr. Afridi argues in the alternative that, even viewed as a demonstrative aid, the video lacked a proper foundation. To authenticate a video, a foundation must be laid by a competent witness having personal knowledge of the filmed subject, who can attest to its accuracy. *Spyrka*, 366 Ill. App. 3d at 167. That was done here. Dr. Donovan testified that she was present for the filming of the video, and it accurately depicted the maximum speed at which the table moved into the bore when using a Siemens 3T MRI machine. That no foundation was laid establishing that the video accurately depicted how the room was set up or how the MRI was conducted is irrelevant. The jury was clearly informed that the video was not intended to establish either of those things.

¶ 84    Mr. Afridi also argues the video's utility as a demonstrative aid was substantially outweighed by the danger of unfair prejudice. He notes that the man lying on the table of the MRI machine in the video shared his same skin tone and the headphones were placed on that individual in the same manner as Mr. Afridi had testified to, with the band beneath his chin. Mr. Afridi argues that the selective inclusion of these unnecessary details unfairly primed the jury to accept NorthShore's theory of the case. The dissent agrees.

¶ 85    We also agree, as Justice Wilson lays out in detail in his special concurrence, that some of

these details were unnecessary to demonstrate to the jury the speed of the machine. However, the majority of this panel, in reviewing this case, have determined that Mr. Afridi cannot demonstrate prejudice to him in the trial court's decision to allow the jury to see the video. It was made clear numerous times at trial that the subject in the video was *not* Mr. Afridi and that the video was not intended to be a recreation of his August 13, 2018, MRI. Mr. Afridi points to nothing that suggests that the jury was either confused or misled into thinking they were watching Mr. Afridi receive the MRI that he alleged caused his injury.

¶ 86    Nor are we persuaded that the late disclosure of the video prevented Mr. Afridi from having his own expert confirm that it accurately depicted the MRI machine at maximum speed. Mr. Afridi's counsel was invited to be present for the filming of the video but refused. Counsel did not send Mr. Afridi's retained expert, Mr. Perez, to evaluate the machine or video or ask for more time to have a different expert do so but instead doubled down on his argument that the video was inadmissible as untimely disclosed real evidence.

¶ 87    The trial court did not abuse its discretion by admitting the video.

¶ 88     B. Whether the Jury's Verdict was Against the Manifest Weight of the Evidence

¶ 89    Mr. Afridi next argues that the jury's verdict was against the manifest weight of the evidence. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999). Here, Mr. Afridi bore the burden of proving beyond a preponderance of the evidence (1) the standard of care that Mr. Parekh owed to patients in Mr. Afridi's position, (2) that he deviated from that standard of care, and (3) that his deviation was the proximate cause of Mr. Afridi's injuries. *Pumala v. Sipos*, 163 Ill. App. 3d 1093, 1098 (1987).

¶ 90    NorthShore is correct that where, as here, special interrogatories were not utilized, we cannot know whether the jury returned a general verdict in favor of the hospital because it believed that Mr. Afridi failed to prove one or all of these required elements. Because "all reasonable presumptions must be exercised in favor of [a] general verdict" (*State Farm Fire and Casualty Co. v. Miller Electric Co.*, 204 Ill. App. 3d 52, 60-61 (1990)), Mr. Afridi must demonstrate on appeal that the evidence was insufficient as to *each* element. He has not done so.

¶ 91    There were only two eyewitnesses to Mr. Afridi's MRI, Mr. Parekh and Mr. Afridi, and each gave a very different account of what occurred. The parties likewise presented dueling experts on the standard of care and whether Mr. Parekh deviated from that standard, with Mr. Perez's opinions on the proper placement of the headphones, the MR technologist's duty to monitor the patient, how to deal with slack in the cord connecting the headphones to the table, and the proper speed of the table as it entered the bore all contrasting starkly with the testimony of Mr. Parekh, Ms. Donovan, and Mr. Rederer.

¶ 92    The parties' experts likewise disagreed over whether Mr. Parekh's actions did or even could have proximately caused Mr. Afridi's injuries. Although the consensus was that Mr. Afridi suffered from cervicogenic headaches, Dr. Moore was certain, based solely on the timing of the onset of those headaches, that they were caused by what Mr. Afridi testified happened during the MRI. Dr. Varadhachary was convinced, however, that even at maximum speed, the MRI table could not have moved far enough and fast enough to damage to Mr. Afridi's cervical spine, a conclusion he found was supported by evidence of degenerative changes in Mr. Afridi's spine that he believed were present for at least six months to one year before the MRI. Where evidence exits on both sides, "it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses'

testimony." *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). As a court of review, we will "not usurp the function of the jury and substitute [our] judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Id.* at 452-53. As is often the case, this was a classic battle of the experts. "Witnesses qualified in their fields stated their opinions and gave their reasons for those opinions." (Internal quotation marks omitted.) *Snelson v. Kamm*, 204 Ill. 2d 1, 36 (2009). The evidence was not so one-sided that the jurors were not entitled to return a verdict in favor of either party and under such circumstances, we will not interfere.

¶ 93    Mr. Afridi argues that the testimony of NorthShore's causation expert, Dr. Varadhachary, should be given less weight than that of the other medical professionals who testified in this case because he never personally evaluated Mr. Afridi. Dr. Varadhachary stated that he declined to do so because the records produced by Mr. Afridi's treating physicians, surgeon, and the plaintiff's expert Dr. Moore were consistent with one another, and from those records, he was able to render his opinion. Unlike the defendant in *Reardon v. Bonutti Orthopaedic Services, Ltd.*, 316 Ill. App. 3d 699, 711 (2000), relied on by Mr. Afridi, Dr. Varadhachary did not disagree with the diagnoses of the other medical professionals who testified—he merely delineated a different cause for Mr. Afridi's headaches—degenerative changes in the cervical spine—and he reasonably explained that that was not something a physical evaluation of Mr. Afridi would have shed any light on. Nor does the record reflect that Mr. Varadhachary was an outlier among a score of other experts who all agreed on the cause of Mr. Afridi's head and neck pain. Mr. Afridi's treating physicians took him at his word when he provided them with his medical history and were concerned with treating his pain, not rooting out its underlying cause. The jurors were entitled to believe Dr. Varadhachary's theory of causation, that the head and neck pain were caused by long term degenerative changes

rather than trauma, particularly where it was supported by the subsequent CT scan and MRI that Mr. Afridi underwent. And they were entitled to disbelieve the theory advanced by Dr. Moore, who was "one hundred percent sure" that Mr. Afridi's injuries were caused by the alleged incident with the headphones, but who could neither identify nor articulate a particular causal mechanism connecting the two.

¶ 94    The jury's verdict was not against the manifest weight of the evidence.

¶ 95                                    IV. CONCLUSION

¶ 96    For all of the above reasons, we affirm the trial court's judgment in favor of NorthShore.

¶ 97    Affirmed.

¶ 98    JUSTICE WILSON, specially concurring:

¶ 99    I concur in the judgment affirming the circuit court.

¶ 100   In my view, the video occupied uneasy ground as a demonstrative exhibit. Like the dissent, I am particularly troubled by the inclusion of a person lying on the table wearing headphones in a manner similar to that described by Mr. Afridi. That feature pushed the exhibit closer to an implied reenactment than a neutral illustration of the machine's operation. See Elder on Behalf of Finney v. Finney, 256 Ill. App. 3d 424, 427 (1993). Had I been presiding over the trial, I likely would not have allowed the video in that form, without significant modification.

¶ 101   Even so, the question before this court is not whether, if faced with the same dilemma, we would have chosen differently. The question is limited to whether the trial court's decision to admit the video for demonstrative purposes was so arbitrary, fanciful, or unreasonable that no reasonable person would have taken the same view. See A.A. v. Nita A., 2023 IL App (1st) 230011, ¶ 38. Where demonstrative evidence is used for dramatic effect or emotional appeal, rather than for factual explanation useful to the jury's reasoning, such use may constitute reversible error. Finney,

256 Ill. App. 3d at 427. On this record, I cannot make that finding.

¶ 102   The video had at least some legitimate demonstrative value. The primary considerations in determining whether demonstrative evidence is admissible are relevancy and fairness. Sharbono v. Hilborn, 2014 IL App (3d) 120597, ¶ 31. One of the central disputed points at trial was whether the MRI table could have moved with sufficient speed to cause the mechanism of injury Mr. Afridi described. The machine's maximum speed, expressed numerically, may have meant little to lay jurors absent some visual aid. To that extent, the video could assist the jury in understanding testimony concerning the table's movement and the physical plausibility of Mr. Afridi's account. See Cisarik v. Palos Cmty. Hosp., 144 Ill. 2d 339, 341-42 (1991) ("[demonstrative evidence] serves *** as a visual aid to the jury in comprehending the verbal testimony of a witness.").

¶ 103   Most importantly, Mr. Afridi cannot show the prejudice necessary to warrant reversal. Relevancy aside, a demonstrative exhibit may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Sharbono, 2014 IL App (3d) 120597, ¶ 31. At every stage, the trial court and the parties made clear that the video was not real evidence, did not depict Mr. Afridi, and was not a reenactment of the incident at issue. The court admitted the exhibit for the limited purpose of illustrating the machine's operation, and the jury was repeatedly informed of that limitation. Whatever concern the video's format may have raised, the risk of unfair prejudice was substantially mitigated by those express limitations.

¶ 104   As a separate and independent matter, I would not characterize the post-discovery disclosure of the video as a discovery violation amounting to reversible error. Although Illinois Supreme Court Rule 218 (eff. Feb. 2, 2023) generally requires discovery to be completed at least 60 days before trial, where an exhibit is offered solely as demonstrative evidence, its use is governed less by discovery principles than by the familiar rules that demonstrative aids have no

independent probative value and are admissible, if at all, in the trial court's discretion and shall not be disturbed by a reviewing court absent a clear abuse of that discretion. See Finney, 256 Ill. App. 3d at 427. Here, even under a stricter view, admission was proper: Mr. Afridi was notified of the exhibit before trial and had an opportunity to inspect it, but declined on the theory that its disclosure violated the discovery order.

¶ 105    Nonetheless, because the video was offered solely as a demonstrative aid, not as substantive proof of what occurred during Mr. Afridi's MRI, its disclosure did not implicate the discovery rules in the same manner as untimely substantive evidence.

¶ 106    I caution that exhibits of this kind straddle the line between real and demonstrative evidence and that today's decision should not be read to deem them categorically admissible; each must be evaluated with careful attention to whether its format risks conveying substantive impressions that exceed its stated purpose. Nevertheless, given the limited purpose for which the video was admitted, Mr. Afridi's opportunity to inspect it before trial, the cautionary instructions given with respect to the use of the video, and the absence of any meaningful showing of prejudice, I agree that the trial court did not abuse its discretion in allowing the jury to view it.

¶ 107    JUSTICE ODEN JOHNSON, dissenting:

¶ 108    I write separately as I believe that the circuit court erred in allowing the video to be introduced as demonstrative evidence rather than real evidence. Accordingly, I would reverse and remand for a new trial.

¶ 109    Physical objects that are admitted into evidence or used at trial fall into one of two categories, real evidence or demonstrative evidence. Sharbono v. Hilborn, 2014 IL App (3d) 120597, ¶ 30. See also Ill. R. Evid. 401 (eff. Jan. 1, 2011). A physical object that has a direct part in the incident at issue such that it has probative value in and of itself is considered to be real

evidence. Sharbono, 2014 IL App (3d) 120597, ¶ 30. On the other hand, a physical object that does not have a direct part in the incident at issue and is only being used to help explain or illustrate to the trier of fact the verbal testimony of a witness or other evidence is considered to be demonstrative evidence. Id. Demonstrative evidence has no probative value in and of itself and is merely admitted or used as a visual aid to the trier of fact. Id. The great value of demonstrative evidence lies in the human factor of understanding better what is seen than what is heard. Id. The use of demonstrative evidence, therefore, is looked upon favorably by the courts because it allows the trier of fact to have the best possible understanding of the matters before it. Id. However, the same human factor that makes demonstrative evidence valuable- that people learn and understand better what they see, rather than what they hear- also makes it possible for parties to abuse the use of demonstrative evidence by giving a dramatic effect or undue or misleading emphasis to some issue, at the expense of others. Id. Thus, in ruling upon the admissibility of demonstrative evidence the trial court must ever be watchful to prevent or eliminate that abuse. Id.

¶ 110    The primary considerations in determining whether demonstrative evidence is admissible or may be used at trial are relevancy and fairness. See Ill. Rs. Evid. 401, 402, 403 (eff. Jan. 1, 2011); Sharbono, 2014 IL App (3d) 120597, ¶ 52014 IL App (3d) 120597, ¶ 31. As for relevancy, for demonstrative evidence to be admissible, it must actually be used to illustrate or explain the verbal testimony of a witness as to a matter that is relevant in the case in question. Sharbono, 2014 IL App (3d) 120597, ¶ 52014 IL App (3d) 120597, ¶ 31. With regard to fairness, even if the relevancy test has been satisfied, demonstrative evidence may still be excluded by the circuit court if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Id. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). A circuit court's

ruling on the admissibility of evidence, including demonstrative evidence will not be reversed on appeal absent an abuse of discretion. Id.

¶ 111  The physical evidence at issue in this case was a video proffered by the defense which purported to show the rate of speed of the MRI machine for trial. While I agree that the video was relevant, I disagree that the value outweighed the danger of unfair prejudice.

¶ 112  Here, plaintiff filed a motion in limine to bar the use of any evidence or testimony of the MRI machine from defendant's site inspection. The circuit court has considerable deference in ruling on a motion in limine, and its decision will not be reversed absent a clear abuse of that discretion. Inman v. Howe Freightways, Inc., 2019 IL App (1st) 172459, ¶ 140. At the oral argument on the motion, defendant argued that the video was demonstrative because the "video truly literally depicts the testimony of the witnesses in this case, and there's no [] controversy." On the other hand, plaintiff argued that the "video is real evidence that is being attempted to show [d]efendants' version of the events that MRI speed was so slow that it could not have caused the injury complained of." The circuit court ultimately denied the motion in limine, finding the video was demonstrative evidence.

¶ 113  Having reviewed the video in the present case, I do not believe that it was properly classified as demonstrative evidence. The use of the video at trial went beyond simply showing the MRI room/machine and control room as defendant indicated during the oral argument on motion in limine. Rather, the video appeared to demonstrate the basis of defendant's theory of the case, namely that the machine moved too slowly to cause plaintiff's injury. In addition to depicting an MRI machine and the rate of speed of the machine, the video also showed a man lying on the MRI machine with headphones under his chin, essentially the same as described in plaintiff's complaint. Defendant argues that the "28 second video neither show the headphone cord being

tucked under a pillow or draped over a shoulder, nor does it show a cord being snagged or pulled taught, nor does it show choking of an MRI patient." Essentially, the video shows everything but the choking, which supports defendant's claim that the choking did not happen.

¶ 114   I see no reason why the video included the presence of the man lying on the MRI machine wearing headphones as described in plaintiff's complaint, other than to try to support, and show the basis for, defendant's argument that the machine moved too slowly to cause the injury. The machine itself and the speed could have been demonstrated without the inclusion of a patient and certainly without headphones.

¶ 115   I would find that the video was real, rather than demonstrative evidence used to unfairly buttress defendant's theory of the case and that its use substantially prejudiced plaintiff. As such, I believe that the circuit court erred in denying plaintiff's motion in limine, and I would reverse and remand for a new trial without the video.